taxes that were levied by a school district. Illinois Supreme Court recognizes that public officials have no taxing power except that which is delegated to them by the legislature, and the obligation of citizens to pay taxes is purely statutory creation, and taxes can be levied, assessed, and collected only in the matter expressly spelled out by the statute. What we ask you to decide in this case is essentially, what's the purpose of the working cash fund? Now, that issue has already been answered rather clearly by the Illinois Executive Branch, the Judicial Branch, the Legislative Branch, and in materials prepared by lawyers that are in record evidence in this case. For the Executive Branch, the Illinois State, I'm sorry, the Illinois School Board of Education, they've specifically stated that a district may transfer money from the working cash fund to any of the operating funds of the district as a loan. The Judicial Branch, the Judicial Branch, our Supreme Court has specifically held that the purpose of the working cash fund is to provide a reserve upon which school districts may draw in anticipation of tax collections. That's N. Ray Waldenbeck. You go all the way back to Matthews v. Chicago in 1930, a case which is still good law, the Supreme Court basically said that, look, the working cash fund constitutes a revolving fund from which money may be transferred to other funds in anticipation of taxes and to be repaid later out of those taxes. But Mr. Popper, aren't they allowed to abolish the working cash fund and then use the money for corporate purposes? Yes, they are allowed to abolish the working cash fund and use it for corporate purposes. An abolishment did not occur in this case. When the transfers occurred in this case, the abolishment was the only way that money could be taken out of the working cash fund. An abolishment meant that the working cash fund was zeroed out. It was not done in this case. It's also, when you talk about abolishment and then later on both of those sections of the working cash fund statute essentially talk about like the working cash would be in existence, would have all of this money. The district didn't need to, not our district here, but a district in general, didn't need to use its money to transfer because taxes were collected timely or anything else like that. Loans were repaid and so because they had so much money in their working cash fund, they decided, you know what, we don't need to use all this money, let's abate it or abolish it. That did not happen here. The facts of this case are specific that the district wanted to obtain additional money. The district realized that 40 cents on a dollar, or I'm sorry, 40 cents out of every hundred dollars of EAV was going to be extinguished in their tax bills to their taxpayers and rather than have the tax bills decreased by 40 cents on every hundred dollars worth of EAV, let's try to capture that. And so what they did is they specifically figured out a way that they could issue new bonds, obtain new debt at a time that they had hundreds of millions of dollars in reserve, not hundreds, but a hundred million dollars in reserve. They had cash on hand, they had the ability to pay for all the funds that they had, but they wanted to be able to access additional funds and that's the way they issued them in this case. Now, Mr. Powers, let me ask you about the elephant in the room, which is 1001 Ogden. Now that's the second district case and even was the first district case, we're not obligated to follow it, but we certainly don't, you know, close our eyes that it actually exists and to the extent it persuades of authority, we follow it. Is there anything in this appeal that's different than 1001 Ogden other than you don't like the result? Yes, 1001 Ogden is wrongly decided. 1001 Ogden and the appellees here are the only people or only places that will say that you can issue bonds and collect taxes and spend it the way that they do. Supreme Court doesn't say, Supreme Court's rulings are inconsistent with 1001 Ogden. Now you ask me what are the things that are inconsistent with 1001 Ogden. 1001 Ogden did not address the P-TEL issue. P-TEL is a very important caveat that's here and and the argument that we're raising was not addressed in that case. Doesn't P-TEL or doesn't the working cash fund statute allow for a backdoor referendum and there's, it appears to be undisputed that in this case, the school district published notice allowed people to file a petition to stop the levy with a backdoor referendum and then no one filed. And because of the way the statute reads, that gets them outside the limitations of the tax cap law which is P-TEL. The working cash fund allows for working cash fund bonds to be issued for working cash fund purposes. Working cash fund purposes are alone. Where 1001 Ogden was absolutely wrong is that it found that a transfers. Now again, this isn't a situation where the district had a lot of money sitting in his working cash fund and decide to abolish or abate it. This is from the get-go. It was issuing bonds with the intention of never putting it in the working cash fund, of never increasing the working cash fund, of never having it on hand and that's significant for several reasons. Number one, the reason that or the the prescriptions in the working cash fund statute for the notices required to issue a bond say that it has specific language and says that it needs to be consistent with the working cash fund. The notices that were issued in this case, they specifically said that it was going to be issued to be to be used in accordance with the statute at the working cash fund statute at the time. At the time, there was no abatement that was allowed. At the time, abolishment was eradicating the notice specifically said that the funds would be reimbursed to the extent that the funds so advanced when such taxes have been collected. That wasn't done in this case and so all of the notices that the taxpayers received in this case or could have received in this case did not contain the true intent of the district from the very beginning as to what they were going to do with this money. Council, I have is this a question of semantics? I mean is your complaint that the way the notices were worded was deceptive, untrue, or just not accurate? What exactly are you contending with respect to the notices and what happened later? This isn't a matter of semantics from the standpoint of is the true purpose and use of the working cash fund to just raise money and permanently transfer it. It's not. The purpose and use is for loans. Now in this case if they would have put in all of their notices that they fully intended to transfer this permanently and to use all of this money in ways for construction and everything else that they did similar to where it's buried in the actual bond, then we'd have a different argument before us. I don't believe that that I still believe that all of those reasons were not valid reasons for issuing working cash fund bonds, but it would be a different set of circumstances and at least the notices provided to all the taxpayers wouldn't have been either fraudulent or deceptive or any of the descriptions that you just stated. None of them include the actual intent that the district from the get-go was raising the money for. So is it a matter of semantics? No it's not a matter of semantics, but even if all of that language was included, which it wasn't, then I would still argue and our contention still is is that the purpose of the working cash fund is a loan. It is not to spend money on other items and that's where it dovetails in and I'll move on unless I didn't fully answer your question. Didn't the school district's resolution say that the money could be used for quote and other school purposes close quote? No it's my additional question so yes please answer that part also council. Sure the the authority to issue bonds they just the school district doesn't get to issue bonds just to decide. They have to get that authority from some specific statutory provision. That specific statutory provision is the working cash fund section. The working cash fund throughout the entire act talks about how it is intended to be a loan. That is so critical and so crucial here because if again they are issuing bonds at the get-go at the inception. This is not where hey we have money that's left let's go ahead and transfer it to the fund most in need and have a resolution that's passed saying that there's a fund most in need and we transfer the money. They did not do that here. What they did is from the beginning they used the authority of the working cash fund which is legislative judicial executive. The purpose is for loans. They never intended to use it as a loan and that's why from the get-go it's illegal. It's not even a matter of discretion in this in this regard because you don't have discretion to do something that you don't have authority for and they didn't have authority to issue working cash fund bonds that would provide proceeds that weren't going to be for a loan and where this where 101 Ogden messed up is that they hung their hat on okay there's corporate purposes that that the bonds were used for. Corporate purposes comes from the first section of the working cash fund bond statute. That isn't read in a vacuum. Corporate purposes are what the loans are for any corporate purpose of the of the school district. So they need the district needs wide latitude in terms of where they're going to loan their money for but throughout the rest of the working cash fund statute the loan is being repaid. It wasn't being repaid here. So 101 Ogden got it wrong from that regard. This wasn't a valid purpose. Number two it hung its hat on and it basically said look the taxpayers in in Ogden complained that the only other way that you can raise money for all the reasons that the district wanted to use it in Ogden was with a building bond a building bond. Building bonds require a referendum. Ogden was correct that there's a litany of different ways that a district can raise money for the uses that school district 54 specifically did in this case. But in every single one of those circumstances there's two prevailing safeguard provisions for taxpayers. Either a each of those provisions requires a referendum a direct referendum not a backdoor referendum or b they require they're capped by p-tel. Now there's one exception to that the one exception to that is life safety bonds and life safety bonds are specific to a situation where it's an emergency fund there's no money that's available in the operations and maintenance fund to pay for it and under those very limited circumstances when the school the state school superintendent oversees all those bonds that's the only exception where bonds can be issued without a direct referendum and without the limits of p-tel for money. That didn't happen here it didn't happen here because the school the district had they were flush with money it wasn't a situation where the operations and maintenance didn't have money and they didn't want to they wanted to spend money on things beyond just life safety that were outside of a control of the state superintendent. So the thing about this is that this case what the district did is they levied an extended debt that their taxpayers have to pay for that normally the taxpayers are protected by p-tel or a direct referendum and in this case neither of those opportunities could did they get the protection from. What they did get is they got notices that said we're issuing working cash fund bonds we're issuing these in accordance with the uh with the statute and in the notices that are that are presented it says that the money is going to be reimbursed it says that the money is going to be held in a separate fund it says the money is going to be maintained but as the working cash fund nothing of that occurred here the moment that the money came in it was transferred if it even went into the working cash fund it went there as a ledger balance and immediately out to the capital uh uh to the capital projects fund so it went there your time is running now but let me ask you a different question sure there's a lot of discussion in the breeze about some sort of 115 million dollar surplus and it it reads to me like that discussion isn't really an excess accumulation levy objection but we don't have that here do we at least in this case this is not an excess accumulation uh objection um an excess accumulation objection would say the district had abused their wanted to have more working cash fund money so that they could loan it that's their discretion to do it but the thing is is that we never get to the discretion because the authority that they look to issue these bonds under is not present because they never ever ever intended to loan this money out they never intended to keep this within the working cash fund they intended to spend it on on on projects and things and this is where the petal argument comes in on items that are capped by petal on operations and maintenance items on capital upkeep on things that normally they would have their annual levy for these items and they would have to pay for them within the annual levies that they received if they want more money for that they either have to pass a referendum and say hey i want to issue bonds for capital purposes i would like to have you increase taxpayers allow us an increase in the annual levy for education or for capital purposes or operations and maintenance let us have more than the petal allows but you only can do that if you pass by a referendum they didn't do that here and so what they did is they ultimately ended up getting money outside of the aggregate extension that's limited they got unlimited money and basically not basically totally um violated petal all right let me ask you to bring your remarks to a close please sure um if i may ask a question though um the school district says there's an exception to petal that applies here what are your thoughts on that the the exception to petal is essentially when they label the bond as a limited bond there are very few circumstances where because you could issue working cash fund bonds as general obligation bonds and if you do that then you're still limited by petal but when they issue the bonds as limited bonds then that limited label takes them out of their aggregate extension and allows them to collect that money in excess of what petal limits now normally the only way that you get to do that is you pass a referendum and the taxpayers say yes that's fine in this case because they did that and normally if you're going to be as a taxpayer if you're going to be paying for working cash fund bonds or working cash fund money um that's outside of of petal you can be comforted by the fact that your taxes are going into a an account that's being used as a loan this what that didn't occur here these taxpayers money didn't sit in the working cash fund it was immediately spent it was immediately transferred and so they get saddled with the debt for projects that any sort of financing and funding under all the other avenues allowed for a district on this which requires petal limitations or voter referendum neither one of those occurred here they their exception is by putting the limit the limited bond on there and limited bonds are only valid as the statute that authorizes them to be issued and that gets us back to the point of look the working cash fund did not allow money to be raised for personal or for for permanent transfers it allows and the purpose of the working cash fund is for loans executive judicial legislature all of them say the purpose of the working cash fund is for loans and that's where ogden missed it that's where the district misses it it's not something that the that you can do the taxpayers were robbed of their ability to contest this the notices that the district provided were not consistent with their actual purposes and use that they intended from the beginning and for that reason ogden is wrongly is wrongly decided and should not be instructive here and the money that the district extracted should be refunded and found that this was invalid and in violation of both the working cash fund and petal all right thank you mr powers mr metcalf you may proceed may it please the court i just wanted to start with one observation about schaumburg community consolidated school district 54 which may put some of the facts in context it is the largest elementary school district in the state of illinois at the time that these bonds were issued it had 13 600 students spread across 27 different campuses and in 2007 the three-year average annual expenditures at district 54 with 166 million dollars so when you look at that in context any amount of money that they had on hand when the bonds were issued was less than one year's worth of of expenditures which is less than half of what the u.s or the public service versus miller so today i just want to pivot and address some of what i consider to be the most important issues in this case and in reality in my opinion this is not as complicated as appellants would like to make it district 54 followed the law but the appellants do not like what the law allowed district 54 to do so appellants proper venue for redress is the general assembly not the courts of illinois council let me ask you a variation on the question that i asked your opponent why is it that the wording on the notice was not consistent with what the funds were actually used for well two reasons one is that the district strictly complied with what the statute requires as we laid out in our brief the notice under 20-7 of the school code followed exactly what was required the notice under the bond issue notification act or bina followed exactly what was required under the law and if by chance someone had submitted a backdoor referendum petition the question that would have been on the ballot would have had nothing to do with the possible intended uses of the funds now the second reason is that the whole point of the working cash fund wait a minute let me let me so are you saying that the intended uses of the fund had is completely separate from what the notice from the notice provision that the statute requires is that what you just said the these we have to remember as much as as council would like to characterize these as article 19 building bonds these are article 20 working cash fund bonds and so the the notices that were placed in the paper followed the statutes under which the bonds were issued which are working cash fund bond statutes and the whole point of the working cash fund is to allow financial flexibility to school districts and if if by chance circumstances had changed after the the bonds were issued but before the money was transferred perhaps the district would have decided to keep the money in the working cash fund rather than permanently transfer it that would have been precluded if the all of the notices said by the way we're going to use all of this money for capital projects then they would have been forced to use all of the money for capital projects and i think in the briefs it goes even further and they would like all of the potential uses specified which would end up in a in an absurd result where there's too much information being provided to the public about all the possible uses that could potentially govern or you know could potentially be the result of how the district decides to use the bond proceeds once they're received so the first high level issue i wanted to address just very quickly is that there is a motion to strike before the court that we filed um i'd be happy to answer any questions about it but if there are none i'll turn immediately to the merits of the case i believe we took that motion with the case didn't we yes that is the order we received all right now the second major issue is that as the court has observed this is not an issue of first impression ogden partners decided by the second district was is virtually identical and although it's not controlling here we feel it's incredibly persuasive and and the outcome is the right outcome because the facts are the same now appellants have asked you to distinguish or ignore that case based on ptel or it being wrongly decided i still have not heard from them why it's distinguishable under the ptel argument or why it was wrongly decided other than that they do not like the outcome of the case obviously the the case is bad precedent for them and i understand why they are taking that position but it's simply re-arguing the same issues in a different forum so briefly what ogden partners handled the same issues in the very same way first the court found that the school code does not prohibit the proceeds of working cash fund bonds from being deposited into the working cash fund which appellants admit happened here and then abated and transferred to a different fund of the district to pay for routine operating and maintenance expenditures and what the ogden partners court looked at was the plain language of the statute are in section 20-10 of the school code it specifically authorizes abatements from the working cash fund and validates all past abatements from the working cash fund and in 2007 the working cash fund article article 20 of the school code had language in it that recognized abatements section 20-9 of the school code at the time the bonds were issued talked about abatements and in doing some some research on the case i noticed that that language has been in the statute of since 1967 so abatements have always been in my opinion a part of what a working cash fund is exists to do and the second major point out of ogden partners is that article 19 of the school code  school buildings article 19's debt limitations are exceedingly higher than what the working cash fund bond limitations are in fact it's 6.9 of the total value of all the property in the district which dwarfs the amount of money that can be raised through working cash fund bonds so it's perfectly logical that a front door referendum is required for such big bonds while a backdoor referendum is required for such smaller bonds like working cash fund bonds and it would be absurd for the districts to place a referendum on the ballot every time they have to borrow money to do roof repairs hvac work or tuck pointing on a building now the last thing that i wanted to point out from the ogden partners decision is that the court also rejected this notion that issuing the working cash fund bonds was somehow a scam i just want to point out that it's in the record all of the public meetings at which the public had an opportunity to hear about the intended uses of the of the bond proceeds there was the july 12th 2007 meeting at which the superintendent laid out the capital improvement needs of the district and talked about different financing options on august 16th there were three different resolutions that were adopted by the board of education there was newspaper notice published on august 21st on september 20th there was a public hearing that where the public could come and speak and on october 18th the board of education finally adopted the the bond resolution and if anyone had come to that meeting on september 20th and expressed opposition to the issuance of the bonds i think it's highly probable that the board would have had second thoughts before it adopted the bond resolution a month later so not only did did district 54 provide ample opportunity for public input it also strictly followed the timelines that are set out in the law now the third major point that i wanted to raise today was that this case doesn't exist in a vacuum there are seven other school districts with their cases currently still in the trial court that have one summary judgment on the exact same issue with nearly identical sets of facts appellants chose not to appeal that decision instead they wanted to make district 54 a test case but i personally know of at least 28 other cook county school districts with the exact same tax rate objection pending so this case does not just affect district 54 it potentially affects millions of dollars of bonds that were issued by the majority of school districts in cook county as to the group of school districts who obtained a successful ruling before schaumburg did all right and you say those did not go up because somebody wanted to make this one the test case was there 304 a language on those or are they still potentially appealable there is 304 language on those cases and the time period for appeal has expired so those are not going to come back up to us correct but there are other districts in the 2007 levy cycle i'm getting the 2007 levy cycle objectors have dismissed all of their complaints against the other school districts for the 2007 tax year um and i'm sure the council will correct me if i'm wrong but i believe they have not been dismissed for 2008 nine or ten okay so the fourth point i wanted to make today was that whatever happened to the bond proceeds after they were deposited deposited into the working cash fund i might add is irrelevant to whether the bonds were issued legally the whole objection here is that the bonds were illegal so whatever happened after the money was deposited into the working cash fund is secondary in nature it doesn't create a harm on the taxpayers because the bonds would still be there whether the money was in the working cash fund or not so that tax rate is not implicated by anything that happens after the bonds were issued in fact appellants admit that there's no factual dispute about all of the steps and procedures that the followed in issuing the law or in issuing the bonds and our brief lays out all of the reasons why all of those steps comply with the law and then they also admit in their brief that the money was deposited into the working cash fund so there there's really no issue about how the money was used and again if the taxpayers and appellants are dissatisfied with what the law allows their objection should be taken to the general assembly is is your response to and or maybe you can give a broader response the question about whether or not any distribution from the general fund needed to be a loan and that was what was not done here can you respond to that sure i i think there it it boils down to a difference of characterization i would agree with appellants that perhaps the primary purpose of the working cash fund is to provide loans to other funds but it's not the exclusive purpose in fact i think a more accurate expression of the intent of a working cash fund is to provide financial flexibility because as i as i previously mentioned there has always been the opportunity to abolish a working cash fund and transfer the money into the educational fund to pay for the the operations of the district and there is effectively always been the option of abating only a portion of the working cash fund and transferring it to an operating fund and so i don't think that it's correct to characterize the the article 20 of the school code as as being exclusively for providing loans to other funds so just highlighting a couple of the issues in our brief i think you know if you were to imagine what would happen if the district had issued these bonds in january of this year what would happen appellants position would have precluded that the district from changing its mind and instead of using the money for capital purposes like hbac repair instead using the money for covid related expenditures or perhaps the change in circumstances from january to now would necessitate the district using the money to cover delays in property tax collections or delays in state aid disbursements and so the appellant position would effectively eliminate a large amount of the financial flexibility that article 20 is designed to provide to school districts now there's also this p-tel issue which seems to be the central issue on which appellants attempt to distinguish the ogden partners decision now i think we all understand that p-tel is a limitation on the operating funds the educational fund the operations and maintenance fund the transportation fund of a school district but it's also a limitation on the debt of a school district it what it does is it creates these limited bonds and they're limited because in addition to the the limitation on the growth and expenditures from the operating funds there's something called the debt service extension base which limits the amount of debt that can be issued under the property tax extension law outside of the tax cap so the district followed all of the requirements for issuing limited bonds within the exception under p-tel so then we have to turn over to the order to characterize bonds as limited bonds first of all the bonds have to be general obligation bonds and identified as limited bonds which they were secondly the annual taxes levied to pay debt service on bonds must be within the taxing district's debt service extension base which they were and appellants have never contested that fact and third the bonds must conform with all of the independent law enabling taxing districts to issue the bonds in other words article 20 of the school code which we've established they followed and so it was perfectly appropriate for these bonds to be labeled as limited bonds and exist where they did within p-tel's overall limitations so in i guess the the last point i wanted to make about p-tel is that there there's also this notion which hasn't really been explored today that p-tel has is somehow also a limitation on the expenditures that can be made from the onm fund the operating and operations and maintenance fund or the educational fund nothing could be further from the truth p-tel is a limitation on the amount of taxes that can be collected for those funds not the money that can be spent from those funds imagine if you will that a wealthy donor decides that he or she wants to fund the installation of air conditioning units in all of the school buildings across the entire district the expenditures of district 54 would ride dramatically above what they could raise through taxation that in no way creates a violation of the property tax extension limitation law because the taxpayers are not harmed  was transferred to fund for fund these projects and so as i mentioned at the beginning i think this case is a lot simpler than appellants would like to to have you believe first of all there's this flawed assumption that the only thing a working cash fund can be used for is to loan money and secondly there's a flawed assumption that the only way to borrow money to repair school buildings is through article 19 construction bonds and once those two pillars collapse there are so does their argument so unless there are further questions i would just ask the court to uphold the decision of the trial court and the granting of summary judgment in favor of district 54 thank you any other questions from the panel members no no question hearing none now mr powers you've got five minutes for a financial flexibility is what mr medcalf and the district would like to characterize this is the judicial the executive the legislative branches do not characterize the working cash fund as financial flexibility it's characterized as providing loans the isbe specifically doesn't describe it as financial flexibility it describes it as something for a loan justice cunningham you're spot on in your question in terms of why didn't the language and the notices match with what their intended uses were if they and the response is well we were just following the statute if they would have followed the statute that would have used language that would have matched their intended uses they would have been issuing bonds under construction bonds that language is found in the construction bond on a statute and that statute requires a direct referendum now is that the only way that um this pillar where this is the only other option that uh districts have no districts have plenty of options for raising money to pay for the items that they paid for here they can accumulate funds within their own um with their within their own uh operations and maintenance fund or their would if their accumulation would be um greater than what would end up as an excess accumulation objection they can pass a referendum or ask their voters for permission to accumulate more money specifically for a project and spend that money within six years that wasn't done here i want to go also talk about in terms of um uh in terms of uh mr mr medcalf statement that look the district could have kept the money if they so chose because they wanted to have that flexibility they absolutely could not and the reason is is all the detail is in our appellate brief the way that they issued these bonds they issued these bonds and included the language about the construction specifically so that they could get a better rate um and allow the people that purchased the bonds to get them tax exempt the money had to be spent right away it wasn't an option where this would stay in the working cash fund in order for them to follow all of the requirements that they had um in issuing these and getting a issuing them the way that they did um they needed to spend the money and so that wasn't an option now am i faulting them for trying to get a a better tax rate or a better interest rate on the bonds that they issued absolutely not the issue is is that they issued bonds without allowing their taxpayers the opportunity to know what was going on we talked about mr medcalf talked about all the notices that were provided and all these different opportunities the the district talked about the true use at a committee of the whole meeting which occurred an hour and a half earlier than the uh regular meeting that everybody goes to and attends at the regular meeting they they simply stated that we discussed some funding options at the next meeting when they when they had the uh referendum or when they when they had the resolution to issue the resolution doesn't state that they're going to use it to build and equip and modify buildings of the district instead they say that they're going to issue uh working cash bond tax working cash fund bonds consistent with the working cash fund statute so that they can have so they can increase the uh amount of the working cash fund and basically have loans they didn't talk about construction at that at during that resolution they didn't and when they did talk about it if they did talk about it it would have been day 30 or day 29 of the 30-day window to which the taxpayers wouldn't have an opportunity to object to it so on the very last day if they read through the entire uh bond issuance that they were putting out on page 17 they would have said we're going to use the funds for building and equipping look at the uh minutes the minutes from the meeting that they that they talked about and they ultimately said look we're going to uh issue these they don't include the full purpose it's a line it's a blank line the purpose for issuing these bonds and then they don't include it in there until afterwards when the secretary types it in in her minutes the taxpayers didn't have any clue that they were going to be used this way and unless they were attending absolutely every single meeting the committee of the whole meetings in advance of the actual uh school board meetings they wouldn't know that's not proper notice and they didn't have a taxpayers didn't have an opportunity to say hey wait a second this isn't the way that the working cash fund is supposed to be used it's not the way the legislature says use it it's not the way that the judiciary says use it it's not the way that the isbe says to use it and taxpayers their remedy is not to go to the legislature on this because right now the legislature what they put in an act there's confusion about it they need the judiciary to say look this isn't the way it's supposed to be read this entire section is for loans and if you don't use it as loans you don't get to then say you know what we're going to issue this under the language that says loans but use it permanently for purposes that are found all throughout the and other options of the school code for building and equipping um mr mr powers let me have you close out with one question i've got that you just let yourself right into sure um 1001 ogden was issued over three years ago and if the legislature felt that the second district misinterpreted the statutes the legislature has had three years to correct that and we do have a doctrine of legislative interpretation um that you know legislative silence is the essence the taxpayers taxpayers only have one option the only option that they have is they get to object to their taxes and that's what occurred here in fact if these taxpayers aren't objecting to their taxes on this matter there's no other way that that they're protected in this matter they're not protected by p-tel because in this circumstance they the district got this out from underneath p-tel they're not protected by a referendum which every place either says it needs to be have a referendum or have p-tel and the district skirted that on each one of these so the only redress that a taxpayer has is to file a tax objection complaint that's what they've done here and it's a tax objection for complaint for the actions that occurred in 2007 not what occurred now and anything else like that it's not financial flexibility that they're seeking they're seeking to pay for improvements that are paid for elsewhere and through other funding and they are skirting p-tel and direct um voter protection of taxes mr powers i'm gonna have to let you end on that note yeah all right thank you very much in a panel if not we will take the matter under advisement and we will instruct our staff to remove the attorneys from the zoom room and we will stand by for our second argument in a few minutes thank you